**DWIGHT C. HOLTON, OSB #090540**
United States Attorney
District of Oregon
**MICHELLE HOLMAN KERIN, OSB #965278**
Assistant United States Attorneys
Michelle.Kerin@usdoj.gov
1000 S.W. Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
    Attorneys for United States of America

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA | CR No. 11-165-HA |
| v. | GOVERNMENT'S SENTENCING MEMO |
| ADAM PERKINS, | |
| Defendant. | |

The United States, by and through United States Attorney Dwight C. Holton and Assistant United States Attorney Michelle Holman Kerin, hereby submits this Sentencing Memorandum for the court to consider in sentencing defendant Adam Perkins.  The government recommends the court sentence defendant to eighteen (18) months imprisonment and three (3) years of supervised release.

I.      **FACTUAL BACKGROUND**

The parties agree that the Presentence Report (PSR) accurately reflects the events that were the basis for the charge against defendant–the defendant lied to multiple lenders in order to obtain homes he could not afford and cash kickbacks that were not disclosed to lenders or title companies. Between April 2006 and January 2006, the defendant purchased more than $5.3 million worth of real estate.[1]  In the course of these transactions, he obtained over $326,000 in loan proceeds that were

---

[1] PSR ¶¶28, 33-35.

not disclosed to the lender, or "kickbacks."[2] The way the defendant achieved this was simple and involved material misrepresentations to the lender.  The seller of a residential property would agree with the defendant, as the buyer of a home, to pay defendant a cash incentive for defendant's purchase. The defendant and the seller would then artificially inflate the sales price to the lender and the appraiser by the amount of the kickback.  Once the lender funded the loan and paid the seller the "sales price" (after offsets), the seller would pay the defendant the agreed upon kickback.  On the eleven properties he purchased in 2006, defendant received kickbacks ranging from $15,000 to as much as $84,000–in some instances, the kickbacks were almost 10% of the purchase price the defendant represented to the lender.  All of the agreements to provide these kickbacks between the various sellers of the eleven properties and the defendant were made outside of escrow and none of these agreements were disclosed to the lender.

Each of these transactions included additional material misrepresentations to induce the lender to approve the mortgage financing.[3]  For example, in all but one of these transactions, defendant represented to the lender that he would occupy the home as his primary residence. This was a material misrepresentation to the lender because at the time, many lenders would allow 100% financing for primary residences but would not permit such financing for investment property.  In addition, lenders would provide discounted interest rates on loans financing a primary residence that were not offered for the purchase of investment homes.  Defendant also significantly overstated his income to lenders.  Defendant represented to lenders that he earned approximately $27,000 per month.  During this time period he actually earned approximately $5,000 per month.

---

[2]PSR ¶28.

[3]PSR, ¶33-35.

Page 2 -      GOVERNMENT'S SENTENCING MEMO

Defendant also failed to disclose to lenders the number of properties he purchased. From June 20, 2006 through August 30, 2006, a mere 70 days, defendant purchased eight pieces of property (and all, except for one, of which he declared to the lender to be his primary residence). In applications for these loans, he failed to disclose all of the properties he purchased. Because of the nature of real property transactions, it generally takes 60-90 days for a mortgage to appear on a credit score. The proximity of these transactions was purposefully designed by defendant and others to disguise the true nature of defendant's liabilities to lenders–by ensuring multiple transactions occurred close in time, defendant was able to purchase more properties and therefore, obtain more cash back. All of the properties that the defendant purchased ended in his default and eventual foreclosure by the lender for amounts significantly less than the amount the defendant paid.

## II.     GUIDELINES CALCULATION

There are no disputes regarding the advisory sentencing guidelines in this matter. The parties agree that the Probation Office properly calculated defendant's criminal history as Category I. The parties further agree that the base offense level is seven (7) pursuant to U.S.S.G. §2B1.1(a)(1)(A) and (B). The parties agree that a sixteen (16) level increase specific offense characteristics pursuant to U.S.S.G. §2B1.1(b)(1)(I)[4] and a two(2)-level enhancement pursuant to U.S.S.G. §2B1.1(b)(2)(A)(I)[5] are both appropriate. The government also agrees that a downward departure of two levels pursuant to U.S.S.G. §3B1.2(b) for the defendant's minor role in the overall fraud scheme and a three (3) levels pursuant to U.S.S.G. §3E1.1 for the defendant's acceptance of responsibility, are appropriate. Finally, as indicated in the PSR, the government will move for a four

---

[4]The loss is more than $1,000,000 and less than $2,500,000.

[5]Defendant's criminal conduct resulted in financial loss to ten or more victims.

Page 3 -    GOVERNMENT'S SENTENCING MEMO

(4) level downward departure pursuant to §5K1.1 for the defendant's substantial assistance. Accordingly, the appropriate guideline level is 16. This results in a guideline sentencing range of 21-27 months. After taking in the factors of 18 U.S.C. §3553(a), the government recommends that the court impose a sentence of eighteen (18) months to be followed by three (3) years of supervised release.

### III.   SENTENCE RECOMMENDATION

#### A.   Legal Standard

The sentencing guidelines are advisory in nature. *United States v. Booker*, 543 U.S. 220 (2005). They are one of the statutory factors that sentencing courts must consider when imposing a sentence. *See* 18 U.S.C. §3553(a)(4); *United States v. Rita*, 551 U.S. 338 (2007). They serve as "the starting point and the initial benchmark" in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 39 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350. The remaining factors include the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant. 18 U.S.C. §§3553(a)(1)-(2). They also include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6). *See also Rita*, 551 U.S. at 347-48 (enumerating the statutory sentencing factors); *Gall*, 552 U.S. at 49 n.6 (same).

In *United States v. Carty*, 520 F.3d 984 (9th Cir.), *cert. denied sub nom. Zavala v. United States*, 128 S.Ct. 2491 (2008), the Ninth Circuit, sitting *en banc*, summarized the

procedures a sentencing court must follow. The court must first correctly determine the applicable guideline range. *Id.* at 991. The court must also allow the parties to "argue for a sentence they believe is appropriate," and must "consider the §3553(a) factors to decide if they support the sentence suggested by the parties." *Id*. The court may not presume the guidelines are reasonable, and should not give them any more or any less weight than any other factor. *Id*. The court "must make an individualized determination based on the facts," and must explain its choice of sentence "sufficiently to permit meaningful appellate review." *Id.* at 991-92.

      B.     **Basis for Recommendation**

The government respectfully recommends that the Court sentence this defendant to 18-months imprisonment, to be followed by three (3) years of supervised release. The government believes that the proposed penalties are imperative to reflect the seriousness of defendant's crime, provide just punishment for the offense, promote respect for the law, to deter defendant from violating the law in the future and significantly, to deter the public from violating the law in the future.

The defendant offers compelling mitigating evidence of his reform beginning January 2008 to substantiate his recommendation of twelve (12) months and one-day imprisonment. Clearly, the criminal conduct defendant engaged in and the basis for his conviction are not the measure of the man today. The government's recommended sentence, however, account for all of the mitigating factors the defendant urges this court to consider.

An eighteen-month sentence is fair and necessary to accomplish the goals of sentencing. This court cannot overlook the harm inflicted by defendant as a result of his very serious fraud. First,

defendant's conduct is truly staggering given its breadth–he purchased eleven (11) homes using materially false representations in less than eight (8) months and received more than $326,000 directly in loan proceeds during this time period. Defendant's fraud was perpetuated by his greed in obtaining the cash kickbacks. Indeed, in some instances defendant agreed to purchase a home **before he ever saw it**; his primary concern was always the cash he would receive from the seller as a result of the transaction.[6] This conduct demonstrates a complete level of disregard for the law. Second, as the PSR writer notes, the defendant was well aware of the criminal nature of his conduct throughout the course of his scheme to defraud lending institutions.[7] In addition to the misrepresentations to the lenders, defendant purposefully used other tactics to conceal his duplicity to the lender, including using different color ink when signing papers for different properties on the same day and preparing elaborate stories to tell lenders if they discovered some of his lies. Third, the loss to lending institutions as a result of defendant's fraudulent conduct is well over $2 million–a significant loss in a mortgage fraud case involving a borrower in this district. If defendant had robbed a bank of $2 million, there would be little doubt the outcome of his sentence. "White-collar offenders * * * should not escape the same punishment [as other criminals] simply because they are better-positioned to make a sympathetic presentation to the judge." *United States v. Edwards*, 622 F.3d 1215, 1217 (9th Cir. 2010)(Gould, dissent from motion for rehearing *en banc*). Thus, given the seriousness of the defendant's offense, the nature of the offense and in order to promote just punishment for the offense, a prison term of eighteen (18) months and a supervised release period of three (3) years is appropriate.

---

[6]PSR, ¶45.

[7]PSR, ¶45.

Page 6 -    GOVERNMENT'S SENTENCING MEMO

It is not sufficient to say, as defendant does, that others were engaged in the same conduct. It is not sufficient to say that the banks looked the other way at borrowers' duplicity.[8] This defendant artificially raised sales prices of real property to ensure he received cash. Defendant purchased significantly more homes than he could afford by lying to lenders about his assets and liabilities. Defendant, predictably, was not able to keep up with the payments and those homes were foreclosed and sold for significantly less than what he borrowed to buy them. This defendant and the other Lighthouse defendants' conduct are a microcosm of part of the reason we are currently in a very serious recession, our community's real estate values have declined precipitously and individuals within this district have seen their primary asset, their home, depreciate before their very eyes.[9] From July 2007 to approximately July 2010 (three months after the main Lighthouse case was indicted), median home prices in the Portland, Oregon metro area went from $301,000 to $235,000[10] and are even lower today.[11] In some of the specific communities in which the defendant purchased homes through fraud in order to obtain the cash kickbacks, the decline is even more staggering. In Happy Valley, Oregon for example, in July 2007, the median home price was $413,000;[12] in July

---

[8] It is significant that throughout the course of this investigation, without exception, each and every lending institution indicated that had defendant disclosed the cash he was receiving from the seller, they would not have made the loan. Most lenders have standing instructions at escrow that a seller is limited in the amount they can give the buyer–precisely because it indicates that the lender's collateral, i.e. the home, is not worth the amount financed.

[9] See, http://en.wikipedia.org/wiki/Subprime_mortgage_crisis (Noting that the defaults on sub-prime mortgages in 2007 was one of the first indicators of the financial crisis of the late 2000's).

[10] http://www.zillow.com/local-info/OR-Portland-home-value/r_13373/

[11] Today the median home price is $230. *Id.*

[12] http://www.zillow.com/local-info/OR-Happy-Valley-home-value/r_31937/

Page 7 -    GOVERNMENT'S SENTENCING MEMO

2010, it was $301,000.[13] The harm to lender's as a result of the defendant's criminal conduct is measurable and precise. The harm to our community and the citizen's of this district is just as real, though less quantifiable. A sentence of eighteen-moths imprisonment demonstrates the seriousness of the defendant's crimes and is just punishment for the crime committed.

An eighteen (18) month sentence of imprisonment promotes both specific and general deterrence. "General deterrence is effective in the context of white collar crime." *United States v. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2009)(BEA, dissenting). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). "White collar crime, especially bank fraud, usually requires a well-schooled, intelligent criminal, capable of gauging the upside of how others will be gulled by his well-honed fables. This ability to foresee extends also to the possible downside of his fraud: apprehension, conviction, and *punishment.*" *Edwards*, 595 F.3d at 1021 (BEA, dissenting). Criminals who seek to manipulate and risk the stability of our lending institutions must understand that there are serious consequences for such conduct. An eighteen-month sentence of imprisonment and three (3) years supervised release will do just that.

## IV.   RESTITUTION

The government seeks $1,211,494.34 in restitution pursuant to the Mandatory Victims Restitution Act. Attachment A to this Sentencing Memo outlines the lending institutions who own the loss for a portion of the defendant's criminal conduct. The lenders for other properties in which the government is not seeking restitution were either non-responsive to the government's requests

---

[13] *Id.*

for information substantiating their loss or the owner of the loss could not be determined after diligent search.

## V.     CONCLUSION

The government believes that the proposed sentence of a 18-months prison term, and three (3) years of supervised release are imperative to reflect the seriousness of defendant's crime, provide just punishment for the offense, promote respect for the law, and deter defendant and others from violating the law in the future.  18 U.S.C. §§ 3553(a)(2)(A) and 3553(a)(2)(B).

Dated this 22nd day of September, 2011.

          Respectfully submitted,

          DWIGHT C. HOLTON
          United States Attorney
          District of Oregon

          */s/ Michelle Holman Kerin*
          MICHELLE HOLMAN KERIN
          Assistant United States Attorney